```
           UNITED STATES BANKRUPTCY COURT
              DISTRICT OF CONNECTICUT



In Re                      * Chapter 7
                           *
                           *
   JAYARAMAN KRISHNAN,      * Case 22-50045(JAM)
                           *
            Debtor.        *
                           *
* * * * * * * * * * * * * * *
```

                        TRANSCRIPT OF

                  341 MEETING OF CREDITORS


                      April 29, 2022


             Electronically Recorded by the
            Office of the United States Trustee


                 Transcript Prepared By:


                 Christine Fiore, CERT
        Fiore Reporting and Transcription Service, Inc.
              4 Research Drive, Suite 402
                 Shelton, CT  06484
                    (203)929-9992

2

```
APPEARANCES:


For the Debtor:            SCOTT CHARMOY, ESQ.
                           Charmoy & Charmoy, LLC
                           1465 Post Road East
                           Suite 100
                           Westport, CT  06880


Chapter 7 Trustee:         GEORGE I. ROUMELIOTIS, ESQ.
                           Roumeliotis Law Group, PC
                           157 Church Street, 19th Floor
                           New Haven, CT 06510


For the U. S. Trustee:     MS. JENNIFER MOREY
                           Office of the U.S. Trustee
                           150 Court Street
                           New Haven, CT  06510


For Raghavendra            STEVEN OUELLETTE, ESQ.
 Vijayangar, Creditor:     William C. Charamut, Attorney
                            At Law
                           1208 Cromwell Avenue
                           Suite C
                           Rocky Hill, CT  06067


For Dr. Acharya,           DAVID C. BANKER, ESQ.
 Creditor:                 Bush Ross, P.A.
                           P.O. Box 3913
                           Tampa, FL  33601
```

```
 1              TRUSTEE ROUMELIOTIS:  Okay.  This is the

 2    Section 341 meeting for Jayaraman Krishnan, case no.

 3    22-50045.  Good morning, sir -- or good afternoon,

 4    sir.  I'm George Roumeliotis.  I've been appointed

 5    as the trustee in your case, and I understand that

 6    we have some participants, some creditors, and other

 7    participants on the line.

 8              If I can simply do a roll call and ask

 9    everybody to appear for the record.  We'll start

10    with Mr. Krishnan and his counsel and we'll sort of

11    go around the virtual room here.  So go right ahead.

12              MR. CHARMOY:  Go ahead.

13              MR. KRISHNAN:  I'm Mr. Jayaraman Krishnan.

14              MR. CHARMOY:  Scott Charmoy for the

15    debtor.

16              TRUSTEE ROUMELIOTIS:  Okay.  Don't be shy.

17              MR. OUELLETTE:  Steve Ouellette.  Steve

18    Ouellette, for creditor of Vijayangar, V-i-j-a-y-a-

19    n-g-a-r.

20              TRUSTEE ROUMELIOTIS:  Thank you.

21              MR. BANKER:  David Banker for Dr. Acharya,

22    another creditor.

23              TRUSTEE ROUMELIOTIS:  Okay.

24              MS. MOREY:  Jennifer Morey, paralegal for

25    the United States Trustee's Office.
```

1          TRUSTEE ROUMELIOTIS:  All right.  And I

2   believe that's it, right?  Is that the correct way?

3   Hold on one second.

4          (Pause.)

5          TRUSTEE ROUMELIOTIS:  All right.  So, Mr.

6   Krishnan, I do need to place you under oath before

7   we proceed.  If you could raise your right hand,

8   please.

9          (The debtor is sworn.)

10   EXAMINATION BY TRUSTEE ROUMELIOTIS:

11      Q    All right.  I have been supplied with

12   copies of some identification for you, consisting of

13   a Connecticut driver's license.  The name matches

14   what is on the petition.  So does the address.

15          And for your Social Security number I've

16   been provided a copy of your Social Security card.

17   The number on that likewise matches what is in the

18   petition.

19          All right.  Sir, have you reviewed the

20   bankruptcy information sheet prior to today?

21      A    Yes, I have.

22      Q    And you understand you're in a Chapter 7

23   case, correct?

24      A    Yes, sir.

25      Q    All right.  Okay.  The address that is

1    listed on your driver's license, as I noted a moment

2    ago, it does match the address on your petition.  We

3    can't say the address out loud on the record, but I

4    do need you to confirm for me, is that the address

5    at which you presently reside?

6         A    Yes, sir.

7         Q    Okay.  Has your employment situation

8    changed at all since the February 3rd, 2022 filing

9    date.

10        A    No.

11        Q    Have you filed bankruptcy before?

12        A    Never.

13        Q    Do you owe child support or alimony to

14   anyone?

15        A    No.

16        Q    Attorney Charmoy, if you can show your

17   client the signature page on the petition, I'd

18   appreciate it.  Sir, your attorney is going to show

19   you the signature page on your bankruptcy petition.

20   I need you to confirm for me that that is your

21   signature.

22        A    No.  I have to look at it.

23        Q    Yes.  Take your time.

24        (Pause.)

25        A    Yes.

1        Q    Okay.  Before signing the bankruptcy

2    documents, did you have an opportunity to review

3    them?

4        A    Yes.

5        Q    Do you believe they contain a true and

6    accurate depiction of your financial circumstances

7    as of the February 3rd, 2022 filing date?

8             MR. CHARMOY:  Mr. Roumeliotis, we have

9    some amendments.

10            TRUSTEE ROUMELIOTIS:  Okay.  Scott, if you

11   can give me just a -- just an example or a summary,

12   I guess, of the amendments that we should be

13   expecting.

14            MR. CHARMOY:  Yes.  Yes.  The debt of Mr.

15   Ouellette's client was actually originally listed at

16   a hundred, because that was the lesser amount if it

17   was paid on time, which it wasn't, so it's actually

18   200.

19            Also, the -- my client has an interest in

20   a defunct company called Primia, that is still

21   alive, because somebody keeps on filing the annual

22   reports for it.  So that has to go on the Schedule B

23   in the SOFA.

24            TRUSTEE ROUMELIOTIS:  Okay.  And is that

25   it so -- as far as you know?

1          MR. CHARMOY:  Yes, that's as far as I

2     know.  As far as I know, yeah.

3          TRUSTEE ROUMELIOTIS:  Okay.  All right.

4     BY TRUSTEE ROUMELIOTIS:

5     Q    So, Mr. Krishnan, other than the changes

6     that your attorney -- that Attorney Charmoy just

7     described, that will be filed, or amendments rather

8     that will be filed with the bankruptcy court, do you

9     believe everything else in the bankruptcy documents

10    is true and correct?

11    A    I do.

12    Q    All right.  Other than the amendment of

13    the creditor list to update an amount due and other

14    than the listing of another-- of an interest rather

15    in another company on Schedules A and B, do you

16    believe that all of the assets and liabilities have

17    been accurately disclosed?

18    A    Yes.

19    Q    Okay.  And, again, other than the changes

20    that Attorney Charmoy has described, do you

21    anticipate needing to make any other changes to the

22    documents?

23         MR. CHARMOY:  The other change is actually

24    the one that's there, the Advanced Innovative

25    Medicine.  We indicated it was not yet dissolved,

1    but it looks like it was dissolved.  So that's --

2    that will be a change as well.

3             TRUSTEE ROUMELIOTIS:  Okay.  All right.

4    All right.  So Mr. --

5             MR. BANKER:  I'm sorry.  I didn't under --

6    I didn't understand that.  What did you say, Mr.

7    Charmoy?

8             MR. CHARMOY:  Yes.  If you look on the

9    Schedule of Financial Affairs, No. 27, the Advanced

10   Innovative Medicine.  Says ceased operation on or

11   about 2016, 2017, not yet dissolved.  It actually

12   was dissolved.

13            MR. BANKER:  Oh, okay.  Gotcha.

14            TRUSTEE ROUMELIOTIS:  All right.

15       Q    So, Mr. Krishnan, other than -- let me see

16   if I can recap it.  Other than two changes to the

17   Statement of Financial Affairs, one to reflect that

18   Advanced Innovative Medicine, LLC has been

19   dissolved, and the addition of another company in

20   which you had an interest, the update to an amount

21   due to one of the creditors, and the listing of an

22   additional company that is in Singapore that hasn't

23   been dissolved yet in your Schedules A and B, other

24   than those things I've just described, do you

25   anticipate making any other changes to the

1    documents?

2         A    No.

3         Q    Okay.  Have you resided in the State of

4    Connecticut exclusively for at least the last three

5    years?

6         A    Yes, sir.

7         Q    All right.  One of the things that I am

8    required to look at prior to -- well, before closing

9    the case, I guess, ideally prior to this Section 341

10   meeting, is your most recently filed federal tax

11   return.  I have not been supplied with any recently

12   submitted tax returns on your behalf.  When was the

13   last time you filed a federal tax return, sir?

14        A    I have not filed a federal tax return in

15   the U.S. at all.

16        Q    Ever?  You've never filed one at all?

17        A    Not that I can recollect.

18        Q    Okay.  How long have you resided in the

19   United States?

20        A    More than 10 years.

21        Q    Okay.

22        A    Fifteen years maybe.

23        Q    All right.  Are you a United States

24   citizen or just a resident alien?

25        A    No, I'm not.

1          MR. CHARMOY:  Hold on a second.  Let's let

2   the trustee finish asking the question before you

3   answer.  It keeps the record clear.

4          TRUSTEE ROUMELIOTIS:  Yeah.  Thanks,

5   Scott.

6          MR. KRISHNAN:  All right.

7       Q    So, sir, are you a United States citizen?

8       A    No.

9       Q    Okay.  Are you a resident alien?

10      A    Yes.

11      Q    Okay.  All right.  Have you filed any tax

12  returns or similar tax disclosure documents with any

13  other jurisdictions in the world in the past three

14  years?

15      A    No.

16      Q    When is the last time you filed any

17  disclosure of income to any governmental

18  jurisdiction anywhere?  When is the last time you

19  did that?

20      A    As I recall, 2010, 2011 time frame.

21      Q    Okay.  And where would that have been?

22      A    In India.

23      Q    Okay.  So your testimony is that the last

24  time you filed a tax return or similar document with

25  any governmental jurisdiction anywhere in the world

1    was in India more than 10 years ago.  Is that

2    correct?

3         A    Yes.

4         Q    Okay.  All right.  In the 90 days prior to

5    the bankruptcy filing -- so just keep in mind that

6    the bankruptcy filing in this case was February 3rd

7    of 2022.  In the 90 day period prior to that date,

8    did you repay any creditor $1,000 or more other than

9    for regular car payments?

10        A    90 days before.

11        Q    So let's just to be on the safe side,

12   let's say from November 1st of 2021 through the

13   filing date, through February 3rd, did you make any

14   payments to any creditor that you owed money to

15   other than on account of a regular car payment?  Oh,

16   and I'm sorry, in excess of $1,000 if I didn't say

17   that.

18        A    I know I paid Mr. Ouellette some amount of

19   money during that time frame.  I don't know exactly

20   the date.

21             MR. CHARMOY:  That was September?

22             MR. KRISHNAN:  I have a feeling sometime

23   September/October.  I'm not sure.

24             TRUSTEE ROUMELIOTIS:  Okay.

25             MR. CHARMOY:  Yeah.  He's asking from

1    November.

2         Q    Yes.  From November 1st forward, sir.

3         A    That's the last I remember.  No.

4         Q    So however you do recall paying Mr.

5    Ouellette's client something, perhaps a few months

6    earlier.  How much did you pay to Mr. Ouellette's

7    client in 2021 all together?

8         A    7,500 one payment.  And I don't know if

9    the second payment actually went to him or was paid.

10   I'm not sure, sir.  I don't remember.  I know that I

11   know for sure that one payment was made and the

12   amount was, I think, 7500 or so.

13        Q    The other payment that you're not sure

14   of --

15             MR. OUELLETTE:  Yeah.  This is Steve

16   Ouellette.

17             TRUSTEE ROUMELIOTIS:  Hang on, Steve.

18   Hang on, Steve.  The other payment -- hang on a

19   second.

20   Q         The other payment, sir --

21             MR. OUELLETTE:  Sure.

22        Q    -- so you remember a $7500 payment.  The

23   other one that you're not sure of, how much do you

24   think that might have been?

25        A    Well, I don't have access to that document

1   right at this very minute, because --

2              MR. CHARMOY:  I'm printing it out for you

3   right now.

4              MR. KRISHNAN:  Okay.

5        A    Because there was a court -- what is that

6   called?  Court settlement and there were payments to

7   be made at regular intervals and I think I made two

8   of them and I don't think I then made the third.

9        Q    Okay.

10       A    That's what my memory tells me.

11       Q    Okay.  All right.  All right.

12             TRUSTEE ROUMELIOTIS:  Mr. Ouellette,

13   you --

14             MR. CHARMOY:  If you give me a minute.

15             TRUSTEE ROUMELIOTIS:  Yeah.  Mr.

16   Ouellette, if --

17             MR. OUELLETTE:  I have some information.

18             TRUSTEE ROUMELIOTIS:  Yeah.  If you can

19   tell me what you know.

20             MR. OUELLETTE:  There was one pay -- yeah.

21   There was one payment made on October 22, 2021 for

22   $7500.  That's it.

23             TRUSTEE ROUMELIOTIS:  Okay.

24             MR. OUELLETTE:  The second -- the second

25   payment was promised, but he --

1          TRUSTEE ROUMELIOTIS:  Okay.  So October

2    22nd of 2021?

3          MR. OUELLETTE:  That's what my record says

4    here.

5          TRUSTEE ROUMELIOTIS:  Okay.  All right.

6    And, Mr. Ouellette, again, and that wasn't a debt

7    owed to you.  That was on account of the debt owed

8    to your client, correct?

9          MR. OUELLETTE:  Correct.

10          TRUSTEE ROUMELIOTIS:  Okay.

11     Q    Mr. Krishnan, does that sound about

12    right?  Mr. Ouellette says that he's only received

13    one $7500 payment.  Is that consistent with your

14    understanding or do you believe that that is not

15    accurate?

16     A    I don't have access to that information

17    that this time, sir.

18     Q    Okay.

19     A    I have a feeling that there were two.

20    There were two payments, but --

21     Q    Okay.  Well --

22     A    -- I'm sure Mr. Ouellette is keeping a

23    record.

24     Q    All right.  But if there happened to be

25    other payments, I'd like to know about them, sir.

1    If you can -- why don't we -- I'm going to make a

2    list.  We're going to start making a list here of

3    things that I'm going to need to get --

4         A    Okay.

5         Q    -- from you afterwards.  So how about just

6    a ledger of payments made to Mr. Ouellette's client

7    or to Mr. Banker's client, if any during 20 -- from

8    January 1st, 2021 through now.

9              MR. CHARMOY:  That's fine.  It will be a

10   short ledger, but yeah, we can do that.

11             TRUSTEE ROUMELIOTIS:  That's fine.

12        Q    All right.  So just to kind of round out

13   that question, then, Mr. Krishnan, other than some

14   payments that you may have made to Mr. Ouellette's

15   client and/or -- I'm sorry -- Attorney Ouellette's

16   client and/or Attorney Banker's client, have you

17   made any payments to any creditor of $1,000 or more

18   in the 90 day period prior to the bankruptcy filing?

19        A    No, sir.

20        Q    Okay.  In the year before the bankruptcy

21   filing -- so this then takes us back to February 3rd

22   of 2021.  In that time frame, did you repay any

23   family members or parties that are affiliated with

24   you through some corporation or company, any amounts

25   that you might have owed them?

```
1        A    No, sir.

2        Q    Okay.  Have you owned any real estate

3   anywhere in the four year period --

4             MR. CHARMOY:  Mr. Roumeliotis, can you

5   just give us 10 seconds?

6        Q    Yeah, sure.

7             MR. CHARMOY:  Okay.  Hold, please.

8        (Pause.)

9             MR. CHARMOY:  Okay.  Sorry about that.  Go

10  ahead.

11            TRUSTEE ROUMELIOTIS:  No problem.

12       Q    All right.  I'll start that question

13  again.  Sir, have you owned any real estate anywhere

14  in the world in the four year period from February

15  3rd, 2018 to February 3rd, 2022?

16       A    No, sir.

17       Q    Do you own any real estate today?

18       A    No, sir.

19       Q    Okay.  In that same four year -- starting

20  with that same February 3rd, 2018 date that I've

21  referred to a moment ago, from that date forward,

22  have you sold or given away anything worth $5,000 or

23  more?

24       A    No, sir.

25       Q    The place that you're living at now, who
```

1   owns that?

2         A    It belongs to my wife.

3         Q    Okay.

4         A    My fiancé.

5         Q    All0 right.  Is it -- is she your wife or

6   your fiancé?

7         A    Fiancé.

8         Q    Okay. And what's her name?

9         A    Sunedta.

10        Q    Hold on one second.

11        (Pause.)

12        Q    So is that Sunedta Prassad?

13        A    That's correct.

14        Q    Okay.  How long has Sunedta Prassad owned

15   that property in which you are presently residing?

16        A    I don't know the exact date, sir.

17        Q    Approximately.  Has she owned it for five

18   years?  Has she owned it for 10 years?

19        A    Ten years.

20        Q    Okay.

21        A    There was no --

22        Q    Yes.  How --

23        A    That's a guess.

24        Q    Yes.  That's fine.  And how long have you

25   known Sunedta Prassad?

1      A    For 20 years.

2      Q    Okay.

3      A    Plus.

4      Q    All right.  When Sunedta Prassad acquired

5    the interest -- her interest in the property -- and

6    just for the record, I think we have to be careful

7    about this, the property in New Canaan at which you

8    reside, when she acquired that interest, did you pay

9    anything towards the purchase price for that

10   interest in the property?

11     A    No, sir.

12     Q    Okay.  And have you been helping her make

13   mortgage payments and/or real estate tax payments

14   for the property in the last 10 years?

15     A    No, sir.

16     Q    Okay.  To the best of your knowledge, is

17   there a mortgage on the property or is it owned free

18   and clear?

19     A    I have no idea.

20     Q    Okay.  All right.  Sir, do you have a safe

21   deposit box or a self-storage unit anywhere?

22     A    No.

23     Q    Do you have any claims anywhere --

24   sorry -- do you have any claims against any third

25   parties where you believe that somebody else owes

1    you money for any reason?  For example, car accident

2    claim, slip and fall, medical malpractice, business

3    dispute, any reason at all where you would have the

4    right to sue someone else.

5         A    At this time, I have no claims.

6         Q    And the claims don't need to have been

7    actually brought in any court.  I mean, do you

8    believe you have the right to pursue somebody for

9    money damages?

10        (Pause.)

11        Seems like a pretty simple question to me.

12             MR. CHARMOY:  It's -- yes.  I -- go -- go

13   ahead and speak.  Go ahead.

14        A    I do think I have claims against Dr.

15   Vijayangar and Dr. Acharya.

16        Q    And just for the record, those folks are

17   listed as creditors in your case.  Correct?

18        A    Yes.

19        Q    And those are the individuals represented

20   by Attorneys Ouellette and Banker who are on the

21   line today; is that correct?

22        A    Yes.

23        Q    Okay.  Have you asserted any counterclaims

24   in connection with the lawsuits brought by Dr.

25   Acharya or Dr. Vijayangar?

1       A     No.

2       Q     Okay.  And why haven't you asserted any

3    counterclaims in those lawsuits?

4       A     One, I was seriously sick and I am.  Two,

5    I'm broke and don't have money to hire an attorney.

6       Q     Okay.  Real briefly, in your own words

7    obviously, what is the nature of the claim that you

8    believe you have against Dr. Acharya?

9       A     I feel that Dr. Acharya was my personal

10   physician.  I feel unethically he got me to invest

11   in Dr. Vijay's company.

12      Q     And you believe that his role -- and,

13   again, I'm not making any comment or -- I'm not

14   attempting to comment as to whether you -- as to

15   whether these claims have any merit.

16            But you believe that as a result of Dr.

17   Acharya's role as your physician that his -- that he

18   should not have involved you in an investment.

19   Something to that effect?

20      A     To the effect that Dr. Acharya and Dr.

21   Vijay were friends for many years and business

22   partners as well, and Dr. Acharya had advised and

23   suggested that investing in him was a good thing.

24   And that Dr. Vijay was a doctor with a lot of claim

25   and whatever he was doing had to be great.

1    Q    Okay.  All right.  So that's the claim

2    against Dr. Acharya.  What do you believe your

3    claims against Mr. Vijayangar would be?

4    A    Dr. Vijayangar induced me into investment

5    in his company when I was in the hospital bed.  He

6    was my cardiologist and advised and suggested at

7    that time when I was serious in the hospital, that

8    his company, AIM, had a stem cell therapy that could

9    indeed cure my heart condition.  And that to save my

10   life, I actually invested in him.

11   Q    Okay.  And AIM is Advanced Innovative

12   Medicine; is that correct?

13   A    That's correct.

14   Q    Okay.  All right.  So how much did you end

15   up investing in AIM and when was that investment

16   made?

17   A    Sir, I don't have access to all the

18   information and details because most of them are

19   with advancing of either medicine accounts, but I do

20   recollect that the first time I gave Dr. Vijay's

21   company a payment was to clear AIM back pay to their

22   employees of October, November, December of 2013.

23   Oh, no, 2014.

24   Q    And just for --

25   A    And the money was used to --

1          Q     I'm sorry.  I interrupted you.  Go ahead,

2    sir.

3          A     In January, I gave money from the

4    hospital.  Payment came so that he could resurrect

5    his lab since his employees were not paid from

6    October of the previous year.  Back pay.

7          Q     Okay.

8          A     If I may add?

9          Q     Yes.  Go ahead.

10         A     Subsequent to that, in January through the

11   whole year, I made several other payments on behalf

12   of the company.

13         Q     Okay.  Within -- I don't know what the

14   range of dollars we're talking about are.  Within

15   $50,000, can you estimate how much you invested in

16   that company?

17         A     Personally, $70,000 plus.

18         Q     Okay.  All right.  So are you confident

19   that it was under 100,000 but more than 50,000?

20         A     I'm confident it's more than 50,000.

21   However, I'm not confident if it is under 100,000.

22   It could be more.

23         Q     Okay.  All right.  And you said that you

24   don't have any of those records?  All of those would

25   be with AIM?

1      A    Yes, sir.

2      Q    All right.  And those investments were

3  made in approximately what time frame?

4      A    In 2015.

5      Q    Okay.  All right.

6           MR. CHARMOY:  George, can you give me a

7  second?

8      Q    Sure.

9           MR. CHARMOY:  All right.

10         (Pause.)

11         MR. CHARMOY:  Sorry about that.  We're

12  back.

13     Q    No worries.

14     A    Sorry, sir.  I was just trying to

15  recollect.  In 2014, 2015 time frame, I personally

16  must have invested -- I recollect 70 or more.  Maybe

17  100 something.  And then I got Primea to invest

18  700,000 in the company.

19     Q    I'm sorry.  You got who to invest 700,000?

20     A    Primea Company from Singapore.

21     Q    All right.  What -- did you -- were you

22  the 100 percent owner of Primea, the company in

23  Singapore?

24     A    Well, I was not 100 percent owner.  At one

25  time, I was in the beginning and then subsequent to

1    that, there were other directors.  That's all.

2        Q    Okay.  All right.  So other than the

3    claims that you just described regarding potential

4    claims rather against Dr. Acharya and Dr.

5    Vijayangar, do you believe you have any claims

6    against anybody else for any reason?

7        A    No.

8        Q    All right.  Do you expect to inherit

9    anything in the near future?

10       A    No, sir.

11       Q    In the event somebody out there does pass

12   away between now and August 3rd of 2022, and because

13   of that somebody might become entitled -- sorry --

14   you might become entitled to money or property

15   through somebody's probate estate or through life

16   insurance, you then would have a duty to notify

17   Attorney Charmoy.  Do you understand that?

18       A    Yes, sir.

19       Q    All right.  Are you the subject of any

20   pending criminal charges or have you been ordered to

21   pay criminal restitution and/or fines that are still

22   owed?

23       A    No, sir.

24       Q    All right.  So the money that you invested

25   in AIM, the money that you personally invested in

1    AIM, was that in exchange for your five percent

2    interest in AIM or is the five percent that you

3    disclosed as a result of the personal investment

4    plus the investment that Primea made?

5         A    The five percent investment was shares was

6    allotted for my personal investment plus being able

7    to make the company run.  Sort of like a performance

8    case.

9         Q    So that -- those shares were granted to

10   you for the personal investment of somewhere between

11   70 and -- perhaps a little over 100,000, plus your

12   work for the company to make it run?

13        A    Yes.

14        Q    Okay.

15        A    To be associated with the company.

16        Q    Okay.  Did Primea have any shares in AIM?

17        A    At the time, yes.

18        Q    How about today?

19        A    In upwards of 70 some percent, maybe 75,

20   80.  Something close to that.  I don't have the

21   exact --

22        Q    Okay.  So Primea owns 75 or 80 percent of

23   AIM?

24        A    Yes, sir.  That's what I believe.

25        Q    Okay.  And who -- and again, who is the

1    owner of Primea?

2         A    Ackley (ph), me, and other directors.

3         Q    Okay.  Is Primea operating at the present

4    time?

5         A    No, sir.

6         Q    Does it have any assets that have any

7    value at this point?

8         A    Not that I know of.

9         Q    What happened to the assets that it did

10   have?

11        A    I have no idea.

12        Q    What kind of business was it?  What kind

13   of assets did it have, other than the interest in

14   AIM?

15        A    I don't recall what other assets we had at

16   that time, I have no access to that information.

17        Q    You were --

18        A    I've been there one time.

19        Q    -- you said you were 75 percent owner.

20        A    I was six some -- yes, I was an investor

21   when the company was formed --

22        Q    Yeah.

23        A    -- and I went six from 2014 and after

24   that, I have no day-to-day operation.

25        Q    What was Primea's business model?  What

1    did it do for business?

2        A    They were doing management consulting and

3    at times they would invest with others on

4    opportunities that came by.

5        Q    Okay.  To the best of your knowledge,

6    Primea is not operating today?  Is that correct?

7        A    As per my knowledge, the company ceased to

8    operate at this time.

9        Q    And when did it cease to operate?

10       A    Based on my recollection, probably 2016.

11       Q    All right.  Can I -- all right.

12            I'm going to just ask you a few questions about

13    some of your debts.  You listed Ferrari Financial

14    Services with a claim of about $141,000.  Did you

15    own a Ferrari vehicle at some point?

16       A    It was leased.

17       Q    And when did you last have possession of

18    that vehicle?

19       A    I recollect 2015 --

20       Q    All right.

21       A    -- or so.

22       Q    So is Ferrari's claim for lease rejection

23    damages?  You breached the lease contract in some

24    way?

25       A    Yes.

1          Q    Okay.  All right.  So again in your words,

2    you list -- well, you listed Dr. Acharya and Dr.

3    Vijayangar as creditors also.

4               You explained your belief that you have

5    claims against them.  To the best of your

6    understanding, what is the nature of their claims

7    against you?

8               And it's okay -- if you don't understand

9    what their lawsuits are about, then it's okay to say

10   that.  Mr. Krishnan.  Mr. Krishnan, did we lose you?

11   Is anybody on the line?  Just want to make sure the

12   line is working.

13         Q    Okay.

14              MS. MOREY:  Yes, I'm here.

15              TRUSTEE ROUMELIOTIS:  All right.  Hey,

16   Scott, are you there?  We'll give them a moment to

17   dial back in.  We must have lost the connections for

18   some reason.

19         (Pause.)

20              TRUSTEE ROUMELIOTIS:  Hang on, folks.  I'm

21   going to call Scott's office.

22         (Pause.)

23              TRUSTEE ROUMELIOTIS:  All right.  Before

24   we lost the connection with Attorney Charmoy and his

25   client, I believe I asked -- and so I guess forget

```
 1    what I asked before.  This is my question now.
 2    BY TRUSTEE ROUMELIOTIS:
 3         Q    Mr. Krishnan, you listed Dr. Acharya as
 4    having a claim of $1.5 million.  What is your
 5    understanding of that claim against you?
 6         A    I don't know.  That just came.
 7              MR. CHARMOY:  Yes.  That's what he's
 8    asking you.
 9         A    So I understand the claim that he's got a
10    $1.5 million claim against me.
11              MR. CHARMOY:  Yes.  That's what he's
12    asking.
13         Q    Yeah.  What's your understanding of it?
14    What is the basis of the claim?
15         A    What?
16         Q    Why --
17         A    I don't understand the basis of it.
18         Q    You don't understand -- you don't
19    understand the basis of his claim?  And that's fine.
20    If you don't -- if that's your answer, then that's
21    fine.  So he's suing you for $1.5 million and are
22    you disputing that in full?
23         A    No.  I'm -- I don't understand the claim
24    because Dr. Acharya made the investment in the
25    company in a Singapore and suing me for it.  So I
```

1   don't understand how I could be responsible for it.

2        Q    Okay.  And you listed Dr. Vijayangar as

3   having a claim or judgment now against you for

4   $100,000.  I believe that's the one that you're

5   going to amend to $200,000.  What's the nature of

6   Dr. -- what is your understanding of Dr.

7   Vijayangar's claim against you?

8        A    My understanding of Dr. Vijay's claim is

9   that he claims that I misled him to invest into his

10  own company.

11       Q    Okay.

12       A    Advanced Innovative Medicine was his

13  company.

14       Q    Okay.  And do you -- and it looks like Dr.

15  Vijayangar got a judgment against you.  Do you

16  believe that that judgment is -- well, after the

17  judgment was entered against you, did you seek to

18  appeal it or did you just let it become final?

19       A    I did not appeal it.  I had no money to

20  appeal.

21       Q    Okay.

22       (Pause.)

23       Q    All right.  I'm going to go back to the

24  New Canaan property for a moment.  The foreclose --

25  apparently, that property is under foreclosure and

1    the foreclosure actions do name you as a defendant.

2    Are you sure you have no ownership interest and you

3    never had any ownership interest in that property?

4         A    That's correct, sir.

5         Q    Okay.  Do you understand you have any idea

6    as to why you've been named as a defendant in that

7    foreclosure case?

8         A    I have not been listed as a defendant in

9    that case.

10             MR. CHARMOY:  Well, he's saying you were.

11   The question is do you know why they would do that.

12        A    I don't know.

13        Q    Okay.  Are you aware that the property is

14   in foreclosure?

15        A    I have heard so.

16        Q    You said your -- that the owner of the

17   property is your fiancé.  I assume she has told you

18   that it's in foreclosure.  Is that correct?

19        A    That's how I've heard.

20        Q    Okay.  All right.  You listed -- you

21   listed no bank accounts in your Schedules A, B.  Do

22   you have any bank accounts in your name anywhere?

23        A    No, sir.

24        Q    Do you have -- and that would include --

25   the question that had the word anywhere in it would

1    include India and Singapore or anywhere else in the

2    world.  So you don't have any bank accounts anywhere

3    in the world in your name?

4         A    No, sir.

5         Q    Okay.  All right.  You testified earlier

6    that you have made at least one payment on account

7    of the judgment held against you by Dr. Vijayangar.

8    Where did that money come from?

9         A    From my mother.

10        Q    And was that paid by check?

11        A    It was paid to Dr. -- or paid to the

12   attorney by check or some draft bank document, bank

13   check I think.

14        Q    Okay.

15        A    I'm not remembering.

16        Q    All right.  But the bank check was on

17   account -- it was drawn on your mother's account?

18        A    I don't recall, sir.

19        Q    Is it possible that your mother gave you

20   the money and then you paid Attorney Banker?

21        A    I did not pay anything to Attorney Banker.

22        Q    Okay.  Can you get a copy of that check

23   from your mother?

24             MR. CHARMOY:  It's Attorney Ouellette.

25        Q    I'm sorry.  Am I mixing up the creditors?

```
 1    I'm mixing up the creditors.  I'm sorry, that's --

 2              MR. CHARMOY:  Right.

 3         Q    Yeah, yeah.  It's to -- to Attorney

 4    Ouellette.  I'm sorry.  So the -- did you pay

 5    anything to Attorney Ouellette from your bank

 6    account or did the funds that will go to Attorney

 7    Ouellette come from your mother's bank account?

 8         A    There was no payment made to Attorney

 9    Ouellette from my bank account.

10         Q    Okay.  Have you had a bank account

11    anywhere in the world in the last two years?

12         A    I don't recall, sir.

13         Q    Have you had a bank account anywhere in

14    the world in the last one year?

15         A    No, sir.

16         Q    Okay.  Where -- so somewhere between

17    perhaps one and two years ago, you had a bank -- did

18    you have a bank account?  Possibly?

19         A    No, sir.

20         Q    Where was the last bank account that you

21    had?

22         A    In Florida I think.  I'm not sure, sir.

23         Q    In Florida you said?

24         A    Mm-hmm.

25         Q    Is that a yes?
```

 1                  MR. CHARMOY:  You have to say yes or no.

 2        A     Yes.  Yes.

 3        Q     And what bank was that at?

 4        A     I think it was Chase Bank in 2014 and '16.

 5        Q     Okay.  So is it your testimony that the

 6   last bank account you had would have been in or

 7   around 2014 and 2015?  And that after that, you had

 8   no bank account?

 9        A     That's what I recollect.

10        Q     Okay.  Was there anybody else on that

11   Chase Bank account with you back in approximately

12   2014/2015?

13        A     No.  As I recall, no.

14        Q     Okay.  Why did you close the account?

15        A     Sir, I had no money.

16        Q     Okay.  All right.  How many people lived

17   in your household, sir?  Is it just you and your

18   fiancé or are there others there as well?

19        A     It's me, my fiancé, my children who come

20   and go, and my mother who comes and goes.

21        Q     And what do you mean by they come and go?

22   Do they stay for extended periods of time with you

23   or they just come and visit for a coffee?

24        A     One of my child is in college.  So --

25        Q     Okay.

1      A      -- when there's vacation.  The other one

2  works and when he has the time he would stop by.

3      Q      Okay.  All right.  So, therefore, your

4  household size is approximately -- well, is you --

5  your fiancé, maybe your child who is in college when

6  he's not in school, and your mother.  So four off

7  and on live at home?

8      A      Yes.

9      Q      Okay.  All right.  And just to confirm,

10  you and Sunedta Prassad, who is your fiancé

11  presently, have you ever been married with her?

12      A      No.

13      Q      Okay.  All right.  Did you ever have an

14  ownership interest in the property at 2289 Bedford

15  Street, Unit D9 in Stamford, Connecticut?

16      A      No, sir.

17      Q      The real estate records for the Town of

18  Stamford suggest that you may have had an ownership

19  in that property in or around -- at some point

20  between 2000 and 2019.  Are you sure you didn't have

21  any ownership interest in some property in Stamford?

22      A      I don't recall, because property was not

23  mine.  There was a company name that belonged to

24  Sunedta.

25      Q      Well, I'm looking at the appraisal record

1    -- I'm sorry, the tax -- what we call the property

2    tax card.  And your name is listed as an owner. Did

3    did you sell a condo or something similar to a Shawn

4    McCauley ever?

5         A    I don't recall.

6              MR. CHARMOY:  Mr. Roumeliotis, can you

7    read that address again?

8              TRUSTEE ROUMELIOTIS:  Certainly.  And it

9    looks like -- it may not be an actual condo.  It

10   looks like it may be a garage.  2289 Bedford Street

11   in Stamford.

12        (Pause.)

13             MR. CHARMOY:  Mr. Roumeliotis, I can't

14   say, but 2019, you know, it's very -- my client's

15   illness -- go and ask your questions, but we'll also

16   take a look at that and it will be on your list that

17   you're going to send us.

18             TRUSTEE ROUMELIOTIS:  Yeah.  Hang on.  I'm

19   pulling up -- I'm trying to find the deed itself.

20   Hang on one second.

21        (Pause.)

22             TRUSTEE ROUMELIOTIS:  All right.  What I'm

23   looking -- and it's a similar spelling, Attorney

24   Charmoy.  So just for the record, there is a deed

25   from Jiard or Jayardman.  Not Jayaraman, but J-a-y-

1    a-r-d-m-a-n, last name Krishna without an N at the

2    end.  And I believe that that is one of your

3    client's aliases that appeared on a credit report.

4              MR. CHARMOY:  Okay.  Well, Mr.

5    Roumeliotis, I prefer to actually see what it is

6    that you're describing to me.

7              TRUSTEE ROUMELIOTIS:  Sure.

8              MR. CHARMOY:  But I --

9              TRUSTEE ROUMELIOTIS:   I will -- Attorney

10   Charmoy, I will save that deed, a copy of that deed,

11   and I will email it to you and ask for more

12   information.  Okay?

13             MR. CHARMOY:  Yes.

14             TRUSTEE ROUMELIOTIS:  All right.  Hang on

15   one second.

16        (Pause.)

17             TRUSTEE ROUMELIOTIS:  Okay.

18        Q    All right.  Sir, do you have any ownership

19   interest or did you ever have any ownership interest

20   in something called AIM Workout Management, LLC?

21        A    No.

22        Q    I'm sorry?

23        A    No.

24        Q    Okay.  The corporate records of Advanced

25   Innovative Medicine, the company we've been calling

1    AIM, lists as its registered agent something called

2    AIM Workout Management, LLC.  Do you know who the

3    owner of AIM Workout Management, LLC is?

4         A    No, sir.

5         Q    Okay.

6         A    I don't know what that is.

7         Q    All right.  Who are the other members of

8    AIM as far as you know?

9         A    As far as I know, Dr. Vijay and Dr.

10   Radju (ph), and a few other people that Dr. Vijay

11   knows.

12        Q    Does Advanced Innovative -- does AIM,

13   Advanced Innovative Medicine, file tax returns or

14   did it ever file tax returns?

15        A    I don't know, sir.

16        Q    Do you have records somewhere that could

17   give me the names and addresses of the various

18   owners of Advanced Innovative Medicine?

19        A    No, I don't.  I have no records of

20   Advanced Innovative Medicine at all.

21        Q    Okay.

22        A    I had to leave in a hurry from there since

23   I was seriously sick.

24        Q    Okay.  Earlier you referred to the Primea

25   Company in Singapore.  There are a few Primea

1    companies that we -- that were noted rather in the

2    district court complaint filed against you.  Primea

3    Global, LLC.  Has that company stopped operating?

4              MR. CHARMOY:  Mr. Roumeliotis, which

5    complaint are you referring to?

6              TRUSTEE ROUMELIOTIS:  The district court

7    complaint brought by -- sorry --

8              MR. CHARMOY:  Mr. -- the Vijayangar?

9              TRUSTEE ROUMELIOTIS:  Correct.

10             MR. CHARMOY:  I'm looking at the

11   complaint.  I don't see Primea entities listed

12   there.

13             TRUSTEE ROUMELIOTIS:  Well, they're not

14   listed as -- oh, wait a minute.  Sorry, I think

15   their the -- I think it's in the Florida lawsuit.

16             MR. CHARMOY:  Yeah.  That would be roughly

17   looking at the Florida complaint.

18             TRUSTEE ROUMELIOTIS:  Yeah.  Yeah.  My --

19   my apologies.  They're wrote --

20             MR. CHARMOY: Primea Energy.

21             TRUSTEE ROUMELIOTIS:  Primea World Wide.

22             MR. CHARMOY:  LTD and Primea World Wide.

23             TRUSTEE ROUMELIOTIS:  Yeah.  And Primea

24   Global.  Are those companies still operating as far

25   as you know?

1               MR. CHARMOY:  I don't see Primea Global.

2               TRUSTEE ROUMELIOTIS:  Okay.  I'm just

3       going trough my notes here.  I picked it up

4       somewhere.  So -- all right.

5               MR. CHARMOY:  I mean, the entities that

6       are there and then please go ahead and ask your

7       question.  Are Primea Energy PTE, TLC Limited and

8       Primea -- actually, yeah, there is.  Primea World

9       Wide PTE, LCD.  Sorry about that.

10              MR. KRISHNAN:  It's only Energy and World

11      Wide PTE.

12              TRUSTEE ROUMELIOTIS:  Okay.

13              MR. CHARMOY:  So go ahead, Mr.

14      Roumeliotis.

15              TRUSTEE ROUMELIOTIS:  Thank you.

16      Q    Are any of the Primea entities, either

17      Primea Energy, Primea World Wide or any other

18      related Primea entities, are they operating at this

19      point?

20      A    None that I know of.

21      Q    Okay.  Did you ever have any control over

22      any bank accounts for any of the Primea entities?

23      A    No, sir.

24      Q    Okay.  Do you have any ownership interest

25      in something called Pertek, P-e-r-t-e-k, LLC?

1       A    No, sir.

2       Q    All right.  There are some other Primea

3   entities and related things mentioned in your credit

4   report.  One is Primea Trading Com.  Did you have --

5   do you have any ownership -- do you have any

6   affiliation with that entity today or did you ever

7   have any affiliation with it?

8       A    None and no.

9       Q    Okay.  Do you or did you ever have any

10  affiliation with Primea Trading?  The first question

11  I asked --

12      A    Yeah.

13      Q    -- dealt with Trading Com.  So the second

14  question is did you ever have any -- or do you have

15  any affiliation with Primea Trading?

16      A    I did.

17      Q    All right.  And how long ago was that?

18      A    2013 or '14.  I don't recall the exact

19  year.

20      Q    Okay.  And what happened to that company

21  as far as you know?

22      A    It was formed and then closed.

23      Q    And when was it closed?

24      A    After maybe three, four months of

25  existence.  That's what I recall.

1      Q     Okay.  And what kind of business did that

2   entity do?

3      A     It did not do any business, sir.

4      Q     Okay.  Did you have any affiliation at any

5   time with something called SS Power Systems?

6      A     No.

7      Q     Or anything with the phrase SS Power

8   Systems or something similar in its name?

9      A     No.

10     Q     Okay.  Did you ever have an auto -- an

11  automobile lease with Bentley Financial Services?

12     A     No.  Not with Bentley Financial Services.

13     Q     Your credit report refers to what appears

14  to be a car lease sometime ago.  It was around 2014.

15  You don't recall any lease with Bentley?  Or perhaps

16  a loan?

17     A     There was no lease -- no lease with

18  Bentley Financial.

19     Q     Did you ever have a car lease with -- a

20  car lease or a car loan with Mercedes Benz?

21     A     Yes.

22     Q     And was that a loan or a lease?

23     A     Lease.

24     Q     Okay.  And when did that lease expire or

25  mature?

1      A     I don't recall the exact date, but it

2    should be in the '16, '15, '16 time frame.

3      Q     Okay.  All right.  Do you have any

4    connection whatsoever to any bank accounts with Bank

5    of America?

6      A     No.

7      Q     Did you perhaps apply for a loan or a

8    credit card with Bank of America at some point in

9    the last year or two?

10     A     I don't recall, sir.

11     Q     Okay.  All right.  Okay.  Do you have

12   today or did you ever have an ownership interest in

13   the property at 1777 Oenoke Ridge in New Canaan?

14     A     No, sir.

15     Q     Okay.  And, again, are you sure you didn't

16   have any connection to Pertek LLC, P-e-r-t-e-k?

17     A     No, sir.

18     Q     Hang on one second.

19     (Pause.)

20     Q     Okay.  And to the best of your knowledge,

21   is there a pending lawsuit against you by American

22   Express?

23     A     No, sir.

24     Q     Okay.  Does American Express have a claim

25   against you, as far as you know?

1        A     I don't recall.

2        Q     Okay.  Yeah.  You didn't list an American

3    Express in your bankruptcy petition.  However, there

4    is at the Secretary of State's website.  And I'm

5    just trying to get back to it.  Hang on a minute.

6        (Pause.)

7        Q     A lawsuit brought by American Express

8    against you and it lists your address in New Canaan

9    and it looks like they got a judgment in 2000.  That

10   doesn't ring a bell to you?

11       A     No, sir.

12       Q     Okay.

13            MR. CHARMOY:  I have a -- I'm looking at

14   what you're looking at, Mr. Roumeliotis, and I'm

15   trying to show it to my client --

16            TRUSTEE ROUMELIOTIS:  Sure.

17            MR. CHARMOY:  -- which is not easy right

18   now, because his eyesight isn't great.  So I have

19   those records.  I can review it with him.

20            TRUSTEE ROUMELIOTIS:  Okay.

21            MR. CHARMOY:  Because I'm not sure what

22   I'm looking at either, but I see an American Express

23   case where a judgment was entered in 2026 [sic], so

24   I can discuss that with my client.

25            TRUSTEE ROUMELIOTIS:  All right.  Okay.

1    Good.  Thank you.  All right.

2              And to the -- does everybody else on the

3    line, I apologize for -- for taking up all -- as

4    much time as I have.  Those are the questions that I

5    had for now.

6              And so I at this point would be happy to

7    turn the floor over to anybody else that has any

8    questions.

9              So I'll just kind of go around the virtual

10   conference room here and offer the floor to -- to

11   anybody else.  So in no particular order, I'll ask

12   Jennifer Morey do you have any questions to ask of

13   the debtor?

14              MS. MOREY:  I do.

15              TRUSTEE ROUMELIOTIS:  Okay.  So you have

16   the floor.

17              MS. MOREY:  Okay.  Thanks, Judge.

18   EXAMINATION BY MS. MOREY:

19        Q    Mr. Krishnan, my name is Jennifer Morey

20   and I'm a paralegal with the United States Trustee

21   Office.  I just have a few questions for you.

22              Do you have any access to other people's

23   bank accounts?

24        A    Pardon me?

25        Q    Do you have access to other people's bank

1    accounts?  Could you make deposits --

2         A    No.

3         Q    -- withdrawals?  Okay.

4         A    No.

5         Q    Okay.  Do you have access to other

6    people's debit cards?

7         A    No.

8         Q    Do you receive Social Security?

9         A    No.

10        Q    Do you receive disability Social Security?

11        A    No.

12        Q    Do you have any foreign currency?

13        A    I have none.

14        Q    Okay.  You have no foreign currency such

15   as bank notes, coins, any type of currency from any

16   other country other than this U.S., anywhere in the

17   world?

18        A    No.

19        Q    Do you have any digital currency?  Crypto

20   currency, Bitcoin?

21        A    No, ma'am.

22        Q    And you have testified I believe earlier

23   that you -- you have no ownership interest in the

24   property in New Canaan?

25        A    That's --

1      Q    Is that an accurate statement?

2      A    -- correct.

3      Q    And just so I'm clear, the one payment

4  that was made to Attorney Ouellette's client, the

5  sources of those funds were made from your mother?

6      A    Yes.

7      Q    You do not have -- you have access to her

8  account?

9      A    No.

10     Q    And if we could just go back to those

11 Primea companies that you have or that you had.  I

12 believe it was Primea Energy and then Primea World

13 Wide, and I apologize if you had already answered

14 Trustee Roumeliotis, if he asked this question.  But

15 when did those businesses stop operating?

16     A    If I recall, probably '15 or --

17     Q    2015?

18     A    -- '16.  2015 or '16.

19     Q    Okay.

20     Did those businesses have any bank accounts?

21     A    Not that I recall.  No.  At least no

22 access for me.

23          MR. CHARMOY:  She's asking if those

24 companies ever had bank accounts.

25          MR. KRISHNAN:  If they ever had a bank

1     accounts?

2             MS. MOREY:  Yes.  Yes.

3        A    Yes.  They did have bank accounts.

4     BY MS. MOREY:

5        Q    Where were those accounts?

6        A    In Singapore.

7        Q    Do you know when those accounts were open?

8        A    2013.  I'm not sure.

9        Q    And do you know when those accounts were

10    closed?

11       A    I don't know the exact date.

12       Q    And you do not have an ownership in Pertek

13    LLC?

14            MR. CHARMOY:  Go ahead and answer the

15    question.

16       A    No, I don't recall.  Not heard.  Where is

17    the company, ma'am?

18       Q    Well, I don't --

19            MR. CHARMOY:  You don't get to ask

20    questions.

21            MS. MOREY:  I'm sorry, Mr. Charmoy.

22            MR. CHARMOY:  I'm sorry.  Go ahead.

23            MS. MOREY:  I'm sorry.

24            MR. CHARMOY:  I interrupted you.  Go

25    ahead.

1            MS. MOREY:  Oh, that's okay.

2     BY MS. MOREY:

3        Q    I was just going to let you all know.  I

4     went up to the Secretary of State's website and I

5     just came across a company called Pertek, P-e-r-t-e-

6     k, LLC.  It looks like that's their principal name.

7     They have the maybe one of -- maybe Mr. Krishna's

8     aliases.

9        A    Where is the company, ma'am, if I may ask?

10       Q    Well, the business address comes up --

11    well, actually, it's listed as 177 and then it's

12    your street address in New Canaan.

13       A    I don't recall the company at all.

14       Q    Okay. I think that's just -- P-e-r-t-e-k.

15       A    I don't recall.

16       Q    Okay.  All right.  Thank you.

17            TRUSTEE ROUMELIOTIS:  All right.  Ms.

18    Morey, do you have any other questions?

19            MS. MOREY:  I was just going to say, right

20    at this time I do not, Trustee.

21            TRUSTEE ROUMELIOTIS:  Okay.  All right.

22    Thank you.  And, again, this --

23            MS. MOREY:  Thank you.

24            TRUSTEE ROUMELIOTIS:  -- we're likely to

25    continue this for documents and maybe additional

1    testimony.  So if you think of something else later,

2    you will let us know.

3                 All right.  Continuing --

4                 MS. MOREY:  Thank you, Trustee.

5                 TRUSTEE ROUMELIOTIS:  Sure.  Continuing

6    the walk around the virtual room, does Attorney

7    Banker have any questions?

8                 MR. BANKER:  Yes, Mr. Roumeliotis.  Thank

9    you very much.

10               TRUSTEE ROUMELIOTIS:  Sure.

11   EXAMINATION BY MR. BANKER:

12       Q    Mr. Krishnan, regarding your name on your

13   Social Security number and your driver's license, is

14   your name Krishna, K-r-i-s-h-n-a, or Krishnan with

15   an n-a-n on the end?

16       A    K-r-i-s-h-n-a-n.

17       Q    Does that mean that you consider your

18   proper legal name to be Krishnan, with an N on the

19   end?

20       A    Yes.

21       Q    Okay.  Do you recall telling me in your

22   deposition in Dr. Acharya's case that your proper

23   legal name was Krishna, without an N on the end?

24       A    I do not recall the testimony.

25       Q    Okay.  Now, you are claiming to the

1    bankruptcy trustee's office that you and Sunedta

2    Prassad have never been married.  Is that what I

3    understood you to testify to?

4         A    Correct.

5         Q    And yet you testified under oath in the

6    deposition that I took in Dr. Acharya's case that

7    you and Sunedta were, indeed, married.  Do you

8    recall that?

9         A    No, sir.

10        Q    Okay.  If you testified in your deposition

11   under oath in Dr. Acharya's case that you and

12   Sunedta were married, would that have been a lie?

13             MR. CHARMOY:  Objection.

14             MR. BANKER:  You can answer, sir.

15             MR. CHARMOY:  I object to that question.

16   It's outside the scope of a 341 meeting.  We're here

17   to discuss my client's assets, business assets,

18   liabilities, things related to property, the estate.

19   Not particular actions.

20             TRUSTEE ROUMELIOTIS:  Attorney Banker,

21   this is George again for the record, George

22   Roumeliotis, just chiming in.  Attorney Charmoy may

23   be right.

24             Again, the scope of a 341 meeting is not

25   to re-litigate or to have a full blown deposition

1    regarding the accuracy of statements made prior to

2    today.

3            You heard Mr. Krishnan's testimony today.

4    If you believe that there's an inconsistency with

5    what he said in prior testimony, then there are

6    options available for you to pursue that

7    inconsistency and get some more information through

8    essentially doing a deposition in the context of the

9    bankruptcy case.

10            And I will refer you to Rule 2004 of the

11   Federal Rules of Bankruptcy Procedure where you

12   could, you know, do a complete, you know, deposition

13   of Mr. Krishnan on wide ranging issues.

14            But a Section 341 meeting really is

15   limited to trying to identify assets that are --

16   that Mr. Krishnan owns and claims that the

17   bankruptcy estate may have as a result of assets

18   that perhaps Mr. Krishnan owned, but transferred in

19   such a fashion as to give the bankruptcy estate

20   rights against third parties and to discuss claims

21   that he may have against third parties, which are

22   now property of the bankruptcy estate.

23            Things of that sort.  More financial

24   related questions.  But so let's try to stay focused

25   on those kinds of questions and I realize that

1    there's a lot of overlap between those two kinds of

2    concepts frequently, but let's just try to stay

3    focused on I guess the purpose of the 341 meeting.

4    Thank you.

5            MR. BANKER:  Okay.  So I don't get to ask

6    that question?

7            TRUSTEE ROUMELIOTIS:  I'm not the -- I

8    don't think I'm the arbiter of that.  You know, I'm

9    not the judge.  If you ask the question and I heard

10   Attorney Charmoy object to it, I don't know what the

11   next step is.  Perhaps Attorney Charmoy will want to

12   indicate that his client is not going to answer that

13   at this present time, but I'll leave that up to

14   Attorney Charmoy.

15           MR. CHARMOY:  I can't have him be

16   answering questions at a 341 meeting about a

17   deposition that he took two years ago in a

18   particular -- or however long it was in a particular

19   case.

20           Certainly if it was a 2004 examination, I

21   mean, that's a different story.

22           MR. BANKER:  Okay.  So I guess, Scott, all

23   I need to know is are you instructing him not to

24   answer?

25           MR. CHARMOY:  Well, I mean -- I mean, if

```
1    it -- yes, I'm instructing him not to answer that
2    sort of question in a 341 meeting, given the
3    circumstances.
4    BY MR. BANKER:
5         Q    All right.  Mr. Krishnan, I understood you
6    to testify that you owned two Singapore companies.
7    One was Primea Energy PTE, Limited, and the other
8    was Primea World Wide PTE, Limited.  Is that
9    correct?
10        A    Yes.  I had investments for shares on
11   those two companies.
12        Q    Right.  And if you -- if you go to the
13   Singapore website, the state sponsored website
14   concerning those two companies as late as
15   February 21, 2022, you remain the sole owner of both
16   of those companies.  Isn't that correct?
17        A    I did not go to the Singapore website to
18   see what is there or not there.  I had no
19   involvement with those companies from 2016.
20        Q    Okay.  But in 2016, you were the sole
21   owner of both of those companies, correct?
22        A    I was not --
23             MR. CHARMOY:  Mr. Banker, please state the
24   names of those companies again.
25             MR. BANKER:  The two companies are Primea
```

1   Energy PTE, Limited and Primea World Wide PTE,

2   Limited.

3                MR. CHARMOY:  Okay.  So then -- but

4   then -- okay, so with that clarification, go ahead

5   and ask your question again.

6        Q    In 2016, Mr. Krishnan, you were the sole

7   owner of those two companies, correct?

8        A    No.

9        Q    Okay.  Who -- who -- if you were not the

10  sole owner, who else owned those companies with you?

11       A    There were two other directors.

12       Q    Sir, I understand that there were what you

13  call directors of those companies and you were a

14  director as well, correct?

15       A    Yes.

16       Q    Okay.  So for example, Mr. Franken and his

17  wife were directors of those companies, correct?

18       A    Yes.

19       Q    But the only owner -- the only shareholder

20  of those companies was you, correct?

21       A    No.

22       Q    Okay.  Do you have any -- has the

23  ownership of those companies changed at all since

24  2016?

25       A    I have absolutely no knowledge of

1    anything.

2        Q    All right.  Let me ask you this.  Tell me

3    who you say the other owners were of Primea Energy

4    PTE, Limited back in 2016.

5        A    If I recall, it was me, the Franken's,

6    another person known to him.  That's all I recall at

7    this time.

8        Q    Okay.  What about Primea World Wide PTE,

9    Limited?  Who do you say that the other owners of

10   that company were besides yourself?

11       A    I recall it to be the same.

12       Q    So Franken and some other person and

13   yourself, correct?

14       A    Yes.

15       Q    Now, one of those companies acquired a

16   substantial interest in an Indian company known as

17   Bode Tree Consulting (ph), correct?

18       A    (No verbal response.)

19       Q    Did you hear the question, sir?

20       A    Could you repeat?

21       Q    One of these companies that you had an

22   ownership in -- interest in, Primea World Wide or

23   Primea Energy, acquired a substantial interest in an

24   Indian company called Bode Tree Consulting, correct?

25       A    I recall something to that effect.  I'm

1    not sure.

2         Q    Okay.  Well, let me help you.  One of

3    these companies, which you had an interest,

4    contributed about a million dollars to buy a

5    substantial interest in Bode Tree Consulting; isn't

6    that correct?

7         A    I don't recall the amount and stuff.

8         Q    I'm not -- you don't have to be precise.

9    It was about a million dollars, wasn't it?

10        A    I don't recall, sir.

11        Q    Okay.  Can you give me an estimate of how

12   much the investment was of one of your Primea

13   companies in the Bode Tree Company?

14        A    I don't recall.

15        Q    Okay.  Was it -- was it more than a

16   million or less than a million?

17             MR. CHARMOY:  Mr. Banker, now I'm going to

18   object.  I think he's asked -- you asked him, he's

19   answered that question several times now.

20             MR. BANKER:  Okay.

21        Q    What happened to the interest in Bode

22   Tree that one of your Primea companies acquired?

23        A    I have absolutely no idea.

24        Q    As far as you know, does either Primea

25   World Wide or Primea Energy still own a substantial

1    interest in Bode Tree Consulting?

2        A    I do not know.

3        Q    You certainly didn't give that interest

4    away, did you?

5        A    I have not done any of that.

6        Q    Okay.  Now, one of your companies also

7    acquired a substantial interest in another Indian

8    company called -- and you'll have to help me with

9    this -- Sreeven Infocom, S-r-e-e-v-e-n, Infocom, I-

10   n-f-o-c-o-m, Limited in Hyderabad, India.  Isn't

11   that correct?

12       A    I don't recall that.

13       Q    Okay.  Are you denying that your company

14   has acquired an interest in Sreeven Infocom, Limited

15   in India?

16       A    I don't recall, sir.

17       Q    Okay.  But if your company did -- one of

18   your companies did indeed acquire that interest in

19   Sreeven Infocom, as far as you know, your company

20   still retained that interest, correct?

21       A    I have no idea.

22       Q    Okay.  Okay.  And by the way, you -- you

23   still have an ownership interest in two Primea

24   companies, right?  Primea World Wide and Primea

25   Energy, correct?

1        A     I don't know what happened to it.  I have

2    no connection to that at all since 2016.  I don't

3    know --

4        Q     Okay.  But you have -- well, you've listed

5    one -- your lawyer, Mr. Charmois [sic] said that he

6    was going to manage your financial statement

7    disclosure to add one of the Primea companies, but

8    there's two of them, right?

9        A     I don't know what -- I don't know what

10   he's saying.

11            MR. CHARMOY:  He's referring to these.

12   You can read them.

13        (Pause.)

14            MR. CHARMOY:  Yeah.  It's just to clarify,

15   Mr. Banker, they -- because the companies appear to

16   still be active, they've got to go on something

17   called a statement of financial affairs, because if,

18   therefore, they're still active, you've still been

19   involved with them in the past four years.

20            I have to discuss -- further discuss with

21   Mr. Krishnan whether the shares are going on

22   Schedule B considering they're a defunct company

23   that will be (indiscernible).  That's what I was

24   referring --

25            MR. BANKER:  Yeah.  And, Mr. Charmois

1    [sic], I will be happy to send you -- I will email

2    you with a copy to Mr. Roumeliotis the profiles, the

3    Secretary of State's profiles on both companies,

4    which are -- which are very much active.  So I just

5    wanted the record to be clear --

6                MR. CHARMOY:  I'm not saying they're not.

7    I'm looking at the Singapore Secretary of State's

8    printout.  Also, not for nothing, it's Charmoy.

9                MR. BANKER:  I'm sorry.  I'm sorry.  I

10   knew that.  I didn't mean to -- innocent mistake.

11   All right.

12       Q    Mr. Krishnan, both Primea Energy and

13   Primea World Wide have bank accounts at the United

14   Overseas Bank of Singapore, don't they?

15       A    I don't know if they have bank accounts

16   with UOB or something now.  I don't know that.

17       Q    I understand that you may not know whether

18   they have bank accounts with as you call it UOB,

19   right, which is United Overseas Bank in Singapore,

20   you may not know whether they have bank accounts

21   now, but certainly they both had bank accounts back

22   in 2016, didn't they?

23       A    I think they had bank accounts with United

24   OB.

25       Q    Okay.  And you, as the owner of those two

1    companies, Primea Energy and Primea World Wide, have

2    the right to get the bank statements from United

3    Overseas Bank in Singapore from both of those

4    accounts, don't you?

5         A    No.

6              MR. CHARMOY:  Mr. Banker, are you saying

7    now?

8              MR. BANKER:  Now.

9              MR. KRISHNAN:  No.

10        Q    And why do you claim that you cannot get

11   those bank statements now?

12        A    I have no access to that.

13        Q    You can call United Overseas Bank and

14   request the bank statements as the owner of the

15   account holder, right?

16        A    No.  Because --

17        Q    Why not?

18        A    -- because I was not managing the accounts

19   in Singapore.

20        Q    Your buddy Franken was, right?

21        A    I don't know --

22             MR. CHARMOY:  Objection to form.  Go ahead

23   and answer the question.

24        A    I don't know which one of them were

25   handling the day-to-day finances.  I was not there.

1    I was here, sick in the hospital.

2         Q    Okay.  But as far as you know, your

3    colleague, Franken, who set up these companies in

4    Singapore for you, set up the accounts at United

5    Overseas Bank for both Primea Energy and for Primea

6    World Wide, right?

7         A    He could have.

8         Q    Okay.  You can get in touch with Franken

9    and say, hey, send me the bank statements for these

10   accounts going all the way back to 2014 up to the

11   present, right?

12        A    I can surely try to reach him, though I

13   don't know where he is at this point.  I --

14        Q    And if you can't get him, you can call

15   overseas -- United Overseas Bank and get the bank

16   statements, right?

17        A    No.

18        Q    No?

19        A    Mr. Franken can.

20        Q    All right.  Mr. Krishnan, I have been

21   asking you to get me those bank statements and you

22   have acknowledged that you have control over those

23   bank statements in your deposition in Dr. Acharya's

24   case, have you not?

25        A    I don't recall that, sir.

1        Q     Okay.

2              MR. CHARMOY:  Mr. Roumeliotis, I respect

3     the ability of creditors to question debtors at 341

4     meetings, but now we're going for two hours.

5              TRUSTEE ROUMELIOTIS:  I know.  I know,

6     Attorney Charmoy, but the questions that he's asking

7     are -- they do fall in the category of curious,

8     because they do fall squarely within Mr. Krishna's

9     control of bank accounts of -- that may or may not

10    have money.

11             And so I do believe Mr. Krishnan is in a

12    position to -- if he doesn't want to answer the

13    question, then I'd like him to say he's -- you know,

14    he doesn't know and I guess we can move on.

15             MR. CHARMOY:  So I'm not saying that.  I'm

16    just saying that, you know, if we need to do a

17    continued date, fine, but --

18             TRUSTEE ROUMELIOTIS:  Well, I'd be happy

19    to do that.  Yeah.

20             MR. CHARMOY:  I mean --

21             TRUSTEE ROUMELIOTIS:  We are -- we are

22    approaching two hours and I realize people may have

23    other things they need to do.  I don't mind --

24             MR. CHARMOY:  Yeah.  Let me -- let me --

25    yeah, could you give me a minute, please?

1          MR. OUELLETTE:  Yeah.  This is Steve

2    Ouellette, just speaking for myself.  I probably

3    have two hours worth of questions myself.

4          TRUSTEE ROUMELIOTIS:  On the --

5    regarding --

6          MR. CHARMOY:  I -- or, then, you know

7    what?  I'm going to -- I'm going to --

8          MR. OUELLETTE:  His representation --

9          MR. CHARMOY:  -- I'm going to have to have

10   a conversation about that.  But for now, can you --

11         TRUSTEE ROUMELIOTIS:  Yeah.

12         MR. CHARMOY:  -- can you just give me two

13   seconds with my client?

14         TRUSTEE ROUMELIOTIS:  Yeah, sure.

15         MR. CHARMOY:  Okay.

16      (Pause.)

17         MR. OUELLETTE:  Mr. --

18         MR. CHARMOY:  Yes, I'm --

19         MR. OUELLETTE:  -- Roumeliotis --

20         MR. CHARMOY:  -- I, you know, I would like

21   to continue and reconvene.  You know, I -- I would

22   like to make myself reasonably available to -- you

23   know, for the 341s and I certainly expect a certain

24   level of questioning, but I would appreciate after

25   two hours if we could reconvene on another date.

1    Okay.

2              MR. BANKER:  And let me -- and Mr.

3    Charmoy, that -- I'm okay with that.  I've just got

4    one last question to wrap up my section.  Can we --

5    can we get that out of the way and then if it's okay

6    with everybody else, adjourn --

7              MR. CHARMOY:  Yeah.

8              MR. BANKER:  -- until next time.

9              MR. CHARMOY:  Go ahead.

10        Q    Mr. Krishnan, have you done anything

11   whatsoever to ask about or to determine what the

12   ownership interests are, if any, of your companies,

13   either Primea Energy or Primea World Wide, in Bode

14   Tree or in Sreeven Infocom?

15        A    I have not done anything to contact them

16   regarding that.

17        Q    And I don't -- do you mean to suggest that

18   you contacted either of those companies for some

19   other reason?

20        A    No, sir.

21        Q    Okay.  So you -- if I understand what

22   you've just said, you've done absolutely nothing to

23   try and figure out what ownership interest you may

24   have indirectly through Primea Energy and Primea

25   World Wide in either of these two Indian companies;

```
 1     is that correct?

 2         A    Yes.

 3         Q    Okay.

 4              MR. BANKER:  Thank you.

 5              TRUSTEE ROUMELIOTIS:  Okay.  Thank you.

 6     All right, folks.  So let's find another time and we

 7     don't have to continue this to a date where I'm

 8     otherwise conducting 341 meetings.  We can, with the

 9     magic of the telephonic hearings, we can do it

10     whenever.  So I am --

11              MR. CHARMOY:  Do we --

12              TRUSTEE ROUMELIOTIS:  Hang on a second.

13              MR. CHARMOY:  -- have to meet to do

14     (indiscernible)?

15              TRUSTEE ROUMELIOTIS:  Say it again.

16              MR. CHARMOY:  So these documents -- do we

17     have the capacity to do this via Zoom so these

18     documents can be displayed for Mr. Krishnan, because

19     as I -- I would expect repeatedly he said he doesn't

20     remember his reference of documents or doesn't --

21     doesn't remember it, didn't look at it.

22              I would like to be able to show him

23     documents and show him deposition transcripts where

24     under oath he's made various representations that I

25     think the trustee should be aware of the nature of
```

1    it.

2              TRUSTEE ROUMELIOTIS:  And they deal --

3              MR. CHARMOY:  I think he needs to have

4    that --

5              TRUSTEE ROUMELIOTIS:  And they deal was

6    financial -- the deal with these financial matters

7    we've been discussing?

8              MR. CHARMOY:  They deal with financial

9    matters.

10             TRUSTEE ROUMELIOTIS:  Okay.

11             MR. CHARMOY:  For instance, there's a

12   whole series of companies in Quebec, the largest

13   Primea -- we already covered that -- Tonisiss

14   Corporation (ph).

15             There's a whole series of companies that

16   had his name associated with it in one form or

17   another, either a Jayaraman Krishna, Jayaraman

18   Krishnan, Krishna Jayaraman, Dr. Krishna, et cetera.

19             So he needs to see these documents in

20   front of him so that he can represent that all his

21   identities have been identified.

22             TRUSTEE ROUMELIOTIS:  Okay.

23             MR. CHARMOY:  And so (indiscernible)

24   various investments.

25             TRUSTEE ROUMELIOTIS:  I have no problem

1    setting it up by Zoom.  Jennifer, are you still on

2    the line?

3              MS. MOREY:  I'm here.

4              TRUSTEE ROUMELIOTIS:  Can you -- do you

5    believe that the -- so obviously these things are

6    being done through the dial-in number that the U.S.

7    Trustee's Office has provided us panel trustees, you

8    don't believe that there would be any problem with

9    us doing the continued 341 meeting on this case by

10   Zoom, do you?

11             MS. MOREY:  Well, I'm making a note here.

12   I have to circle back with Attorney Holley

13   Claiborn --

14             TRUSTEE ROUMELIOTIS:  Okay.

15             MS. MOREY: -- in this case.  I will be --

16   I will not be able to speak to her until Monday.  I

17   can ask her about that and then get back to you on

18   it if there's a way that we can conduct the

19   continued 341 meeting through a Zoom platform?

20             TRUSTEE ROUMELIOTIS:  Yeah.  I have my own

21   Zoom account.  I can set it up.  That's not a

22   problem.

23             MR. CHARMOY:  The problem -- Mr.

24   Roumeliotis, the problem is security.  You know,

25   like I know that the Court does its Zoom in a

1    specific way.  And, you know, so that the line is

2    secure.

3            But I was also going to suggest if we

4    can't do Zoom and Mr. Ouellette wants us to take a

5    look at things, as long as they're not, you know,

6    voluminous, I mean, he can send them to me --

7            TRUSTEE ROUMELIOTIS:  Yeah.  Can you do --

8            MR. CHARMOY:  -- so that I'll have them.

9            TRUSTEE ROUMELIOTIS:  -- yeah.  Can you do

10   that, Attorney Ouellette?  I think that -- that may

11   make some sense.  There -- your request is not

12   unreasonable, but the reason I stopped and asked Ms.

13   Morey about that is that there is an approved way of

14   doing these and maybe it's -- maybe it's because of

15   security related issues.  I don't know why, but we

16   have to sort of try to stay within the system.

17           So can you circulate those documents ahead

18   of time?

19           MR. OUELLETTE:  I guess I could put a

20   packet together, have them Bate stamped and

21   circulate to everybody.

22           TRUSTEE ROUMELIOTIS:  Yeah.  Why don't we

23   do that?

24           MR. OUELLETTE:  And proceed that way.

25   Just --

1        TRUSTEE ROUMELIOTIS:  Yeah.  And then you

2   can refer to --

3        MR. OUELLETTE:  As long as it's

4   (indiscernible).

5        TRUSTEE ROUMELIOTIS:  Yeah.  You can --

6   you can refer to, you know, this document, page

7   three, let's take a look at it.  I think that that

8   would work all right.

9        MR. OUELLETTE:  Okay.

10        TRUSTEE ROUMELIOTIS:  Okay.  I'm looking

11   at my calendar here and I'm going to simply suggest

12   a date and people can tell me if they're available

13   or not.

14        So assuming, Attorney Ouellette, that you

15   can get those documents around to us all within

16   let's say a week, and then, you know, perhaps give

17   us another week to take a look at them, would folks

18   be available on -- let's see here.  May 12th, which

19   is a Thursday, or May 13th, which is a Friday?

20        Right now, I'm wide open on either of

21   those dates.

22        MR. OUELLETTE:  I can probably get you the

23   documents by hopefully by the 9th.  And the 13th is

24   good with me.  And the next day I have is the 19th.

25   So either the 13th or the 19th is fine.

1          TRUSTEE ROUMELIOTIS:  All right.  I'm

2     looking at my 19th here, and my -- May 19th also

3     looks good for me.  So let's go around the room.

4     Mr. Banker, are you available either of those days?

5          MR. BANKER:  The 13th works for me.  The

6     19th I have a conflict.

7          TRUSTEE ROUMELIOTIS:  Okay.  All right.

8     We'll stick with the 13th then.  Ms. Morey, are you

9     available on the 13th?

10          MS. MOREY:  I am available, but I do need

11     to discuss this case with Attorney Claiborn.  I'm

12     not sure of her availability --

13          TRUSTEE ROUMELIOTIS:  Sure.

14          MS. MOREY:  -- but I am available.

15          TRUSTEE ROUMELIOTIS:  Okay.  I don't think

16     there are any hearings on Fridays these days.  So

17     hopefully she would be available if she wanted to

18     chime in.

19          But -- all right.  So it looks like the

20     13th.  And, Scott, and your client --

21          MR. CHARMOY:  Hold on a second.  Guys --

22     guys, hold up.  Hold up.  I think my client is

23     telling me he's got some medical procedure on the

24     13th.

25          (Pause.)

1          MR. KRISHNAN:  Yeah, the 19th looks okay.

2          MR. CHARMOY:  Yeah, the 19th isn't good

3    for Mr. Banker.

4          TRUSTEE ROUMELIOTIS:  What about the 20th

5    -- what about the 20th, folks?

6          MR. KRISHNAN:  The 20th, yes, okay.

7          MR. CHARMOY:  This is good

8    (indiscernible).

9          MR. BANKER:  20th is good for Banker.

10          TRUSTEE ROUMELIOTIS:  Okay.  How about

11    Ouellette?

12          MR. OUELLETTE:  Good for Ouellette.

13          TRUSTEE ROUMELIOTIS:  All right.

14          MR. OUELLETTE:  Ouellette is good on the

15    20th.

16          TRUSTEE ROUMELIOTIS:  All right.  How

17    about Morey?

18          MS. MOREY:  20th does not work for me,

19    however, I think Attorney Claiborn, I'm just looking

20    at a calendar right now, may be available.

21          TRUSTEE ROUMELIOTIS:  Okay.  All right.

22    So let's pencil --

23          MS. MOREY:  I'd have to follow-up with her

24    on Monday.

25          TRUSTEE ROUMELIOTIS:  All right.  So why

1    don't we do this, folks.

2               MS. MOREY:  Yes.

3               TRUSTEE ROUMELIOTIS:  We'll docket a

4    continuance on this 341 meeting, we'll docket it

5    early next week once we've heard back from the U.S.

6    Trustee's Office to see if Attorney Claiborn is

7    available on the 20th.

8               But let's all pencil in the 20th, and I'm

9    going to simply suggest that we get started early.

10   So I can start as early as 9:00, but I understand if

11   folks want to start at 10:00, that's fine.  What's

12   everybody's pleasure?

13              MR. CHARMOY:  Well, let's set it 9:00.

14              MR. BANKER:  Banker says 9:00.

15              MR. KRISHNAN:  Friday?

16              MR. CHARMOY:  Yes, Friday.

17        (Pause.)

18              MR. KRISHNAN:  You're saying May 29th?

19              TRUSTEE ROUMELIOTIS:  Twenty, 20.  Two

20   zero.  That's a Friday.

21              MR. CHARMOY:  Yes.  The 20th is Thursday.

22              TRUSTEE ROUMELIOTIS:  Not this year.

23              MR. KRISHNAN:  Okay.  Yeah, we can do 9

24   o'clock.

25              MR. CHARMOY:  I'm overruling you, because

1    I don't want to do 9:00.  You're not getting me here

2    9:00 on Friday.  We'll do 10:00.

3              TRUSTEE ROUMELIOTIS:  10:00 is fine.

4              MR. CHARMOY:  10 o'clock.

5              TRUSTEE ROUMELIOTIS:  All right.  10

6    o'clock -- all right.  I'm just going to -- I will

7    just call it.  So we'll pencil in 10 o'clock on May

8    20th and we will -- and so, Jennifer, if you can

9    circle back with Holley and just let me know if

10   that's a no go for her, if you can let me know

11   Monday, that would be great.  Otherwise --

12             MS. MOREY:  Absolutely.

13             TRUSTEE ROUMELIOTIS:  -- so I'll put a

14   note in my calendar on Monday to touch base with you

15   to confirm that.

16             MS. MOREY:  Yes.

17             TRUSTEE ROUMELIOTIS:  All right.

18             MS. MOREY:  And, George --

19             TRUSTEE ROUMELIOTIS:  Yeah.

20             MS. MOREY:  -- just so I'm clear, you're

21   going to be continuing this on the regular 341

22   meeting platform?

23             TRUSTEE ROUMELIOTIS:  Correct.  We're

24   going to continue it on the --

25             MS. MOREY:  The (indiscernible) --

1           TRUSTEE ROUMELIOTIS:  -- same --

2           MS. MOREY:  -- got it.  Okay.

3           TRUSTEE ROUMELIOTIS:  -- the same dial-in

4    -- yeah, the same dial-in we've been using --

5           MS. MOREY:  Yeah.  Because I don't --

6           TRUSTEE ROUMELIOTIS:  -- yeah.

7           MS. MOREY:  -- yeah.

8           TRUSTEE ROUMELIOTIS:  So --

9           MS. MOREY:  Same dial-in?  Okay.  Dial-in.

10   Okay.  Thank you.

11          TRUSTEE ROUMELIOTIS:  Yeah.  So -- yeah,

12   so no Zoom platform, at least now and the

13   documents --

14          MS. MOREY:  Okay.

15          TRUSTEE ROUMELIOTIS:  -- that Attorney

16   Ouellette wants to refer to, he will circulate, you

17   know, in the next week or week and a half, so we'll

18   have plenty -- so we'll have the documents he wants

19   to refer to in front of us and he can go ahead and

20   do that.

21          MS. MOREY:  Very good.  Thank you.

22          MR. BANKER:  One -- one -- how can I go

23   about getting a transcript of today's testimony?

24          TRUSTEE ROUMELIOTIS:  Sure.  The --

25          MS. MOREY:  You would --

1          TRUSTEE ROUMELIOTIS:  Oh, I'm sorry.  Go

2     ahead, Jennifer.

3          MS. MOREY:  Oh, go ahead, George.  Go

4     ahead.

5          TRUSTEE ROUMELIOTIS:  I was simply going

6     to say probably the same thing Jennifer was going to

7     say.  These recordings -- these meetings are

8     recorded.  An MP3 file is generated.  I submit the

9     recordings to the office of the U.S. Trustee and you

10    can request a recording from them.

11         But I have no problem -- Jennifer, I've

12    given recordings to folks when they've asked it.

13    It's the same MP3.  So, you know, I can certainly

14    get you a copy of this MP3 as well.  I don't know

15    how big it's going to be, since it's two hours.  I

16    don't know if it will fit in an email.  Hopefully it

17    will.  Or if it doesn't --

18         MR. BANKER:  Well, I guess -- I'm sorry.

19    I'm just not -- I'm not really familiar with the

20    process, but does -- does somebody create a

21    transcript?  I guess that's what I'm asking.

22         TRUSTEE ROUMELIOTIS:  No.  So it's --

23         MR. BANKER:  Do I have to request the

24    creation?

25         TRUSTEE ROUMELIOTIS:  I think you'd have

1    to request the creation of a transcript.  The -- the

2    record is kept in an audio file and it's got to be

3    turned into a transcript at some point.

4              MR. CHARMOY:  Right.  You get the --

5              MR. BANKER:  I got it.

6              MR. CHARMOY:  -- you get the audio file

7    and you have to go turn it into a transcript using a

8    reporter?

9              TRUSTEE ROUMELIOTIS:  Right.

10             MR. BANKER:  Okay.  I gotcha.  I gotcha.

11             TRUSTEE ROUMELIOTIS:  Yeah.

12             MR. BANKER:  All right.

13             TRUSTEE ROUMELIOTIS:  All right.  So

14   Jennifer, you and I will talk on Monday.

15             MR. CHARMOY:  The 20th.

16             TRUSTEE ROUMELIOTIS:  And about the 20th,

17   but otherwise, let's all pencil in May 20th at

18   10:00 a.m.  Same -- same dial-in information.  Okay.

19             MR. CHARMOY:  Thank you.

20             MR. OUELLETTE:  Thank you.

21             TRUSTEE ROUMELIOTIS:  All right.  Thanks.

22             MS. MOREY:  Thank you.

23             TRUSTEE ROUMELIOTIS:  Thank you.  Okay.

24             MR. CHARMOY:  All right.

25        (Meeting adjourned.)

1

2          I, CHRISTINE FIORE, court-approved

3    transcriber and certified electronic reporter and

4    transcriber, certify that the foregoing is a correct

5    transcript from the official electronic sound

6    recording of the proceedings in the above-entitled

7    matter.

8

9    *Christine Fiore*

10   _____          April 20, 2023

11        Christine Fiore, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24

1                               INDEX

2                                                       <u>Page</u>

3      Examination by Mr. Roumeliotis            4

4      Examination by Ms. Morey                  45

5      Examination by Mr. Banker                 50

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25